**Linda M. KOCSIS, Plaintiff–Appellant,**

v.

**MULTI–CARE MANAGEMENT, INC., d/b/a Bath Manor Special Care Centre, Defendant–Appellee.**

No. 95–3507.

United States Court of Appeals, Sixth Circuit.

Argued June 14, 1996.

Decided Oct. 15, 1996.

John P. Moss (argued and briefed), Tallmadge, OH, for Plaintiff–Appellant.

Lester W. Armstrong (argued and briefed), Belkin & Harrold, Cleveland, OH, for Defendant–Appellee.

Before: BROWN, KENNEDY, and WELLFORD, Circuit Judges.

WELLFORD, Circuit Judge.

Plaintiff Linda M. Kocsis appeals the district court's grant of summary judgment in favor of defendant in this action in which she alleges that defendant discriminated against her because of her disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").

## I. BACKGROUND

Defendant, Bath Manor Special Care Centre ("Bath Manor"), is a 150–bed skilled and intermediate care nursing institution which is operated by Multi–Care Management, Inc. ("Multi–Care").[1] The Bath Manor facility is comprised of four units, three intermediate care units and one skilled care unit. Each intermediate care unit is staffed with one licensed practical nurse ("LPN") and a number of nursing assistants. The skilled care unit is staffed with one registered nurse ("RN"), who serves as the unit supervisor, one LPN and several nursing assistants. The nursing supervisor supervises the nursing staff on all four units. Plaintiff Kocsis, an RN, was hired by the defendant for the position of nursing supervisor in August, 1992. In that position, plaintiff initially was paid $16.00 per hour and received family coverage medical insurance. She later received a raise to $16.35 per hour.

When plaintiff began working for Bath Manor, she submitted a copy of her health record, dated July 27, 1992, which indicated that she had a history of fibromyalgia[2] but

---

1. We refer to Multi–Care, d/b/a Bath Manor, as defendant hereafter.

2. THE MERCK MANUAL (Fifteenth Ed.), "Nonarticular Rheumatism," page 1271, describes "fibromyalgia" as:

Fibromyalgia indicates pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other "white" connective tissues. Various combinations of these conditions may occur together as "muscular rheumatism." Any of the fibromuscular tissues

no "serious illnesses." Plaintiff also submitted a supplemental health document, dated August 22, 1992, in which she indicated that the only illness she had was arthritis, and that she had no physical limitations.

Plaintiff subsequently began experiencing health problems. She stated in an affidavit that in December, 1992, and January, 1993, she informed her superiors about her problems and that she suspected that she had multiple sclerosis ("MS").[3] Plaintiff underwent an MRI on January 26, 1993, but she did not notify defendant of the procedure. On January 28, 1993, her doctor, Dr. Mark Smith, referred her to a neurologist, Dr. Jon I. Weingart.[4] Plaintiff submitted a note to defendant from Dr. Weingart, dated February 1, 1993, that ordered "no work for 1 week" without providing the defendant a reason for the absence.[5] Suzanne White, then assistant director of nursing, made a notation on the doctor's note stating that "Linda Kocsis will furnish us with reports as soon as tests are completed."

On February 15, 1993, Susan Lozenski was hired as director of nursing. On or about March 29, 1993, Lozenski informed plaintiff that she was to be reassigned to the position of unit RN of the skilled care unit ("unit

RN"), effective April 1, 1993. Lozenski told Kocsis that she was being reassigned because of her poor performance as nursing supervisor. In support of the allegation of poor performance, defendant submitted evidence of two performance evaluations and one record of disciplinary warning issued against Kocsis.[6] Kocsis claims that the evaluations support her allegation that she was "demoted" because of her physical health condition, noting that her February evaluation states: "Linda has recurring health problems which have affected her performance. The 7–3 shift is physically and mentally demanding and I am not sure Linda can continue to handle this."

As unit RN, Kocsis' rate of pay initially remained the same and was eventually increased to $17.35 per hour. She also continued to receive the same benefits in her new position. Defendant presented evidence that the position of nursing supervisor and unit RN were very similar, differing only in the number of patients and employees for whom each position was responsible. Kocsis testified, however, that the position of unit RN was much more physically demanding than that of nursing supervisor. As a unit RN, her shift was still from 7:00 a.m. to 3:00 p.m.,

---

may be involved, but those of the low back (lumbago), neck (neck spasm), shoulders, thorax (pleurodynia), and thighs (aches and "charleyhorses") are especially affected. There is no specific histologic abnormality, and the absence of cellular inflammation justifies the preferred terminology of fibromyalgia rather than the older terms of fibrositis or fibromyositis.

3. Plaintiff did not name in her affidavit the superiors to which she disclosed her suspicions, but she stated in her claim to the Ohio Civil Rights Commission ("OCRC") that she informed both Sheila Jordan, corporate director of nursing, and Suzanne White, assistant director of nursing, that she suspected that she had MS.

4. In her claim to the OCRC, Kocsis stated that she was diagnosed with MS on January 28, 1993. In her affidavit, she stated that she advised her superiors of the diagnosis at that time. Her deposition testimony reveals, however, that she never submitted any written diagnosis to the defendant until April, 1993. Other than the assertion in her affidavit, Kocsis has submitted no evidence that defendant knew that she was diag-

nosed with MS before the allegedly discriminatory conduct occurred.

5. Kocsis stated that Dr. Weingart had prescribed "[f]ive days of [intravenous] Solu–Medrol followed by oral Prednizone [sic]." The district court presumed, we think reasonably, that plaintiff had received this treatment when she took the one week off as ordered by Dr. Weingart.

6. In the first evaluation, dated November 25, 1992, Kocsis received average marks with a notation that she had "made great strides in correcting mood swings and improving her interactions [with] staff," and that she needed to "study geriatrics closely and become more aware of problems with residents." The second evaluation, dated February 22, 1993, performed by a different supervisor, noted that Kocsis needed to know more about geriatrics, that she had "mood swings," that she had "frequent errors in judgment," and that she sometimes had difficulty dealing with others. That evaluation also noted that Kocsis failed to command respect and confidence from the personnel. The administrative warning, which was issued on January 9, 1993, indicated that Kocsis did not inform a family when their relative was transferred to a hospital.

and she claims she had to perform more tasks related to resident care, such as lifting and maneuvering residents, in contrast to her duties as nursing supervisor. Kocsis testified that she was able to perform all of the physical demands of a unit RN, and that, consequently, she never asked the defendant for any type of accommodation.

On February 22, 1993, prior to her reassignment, plaintiff applied for a corporate nursing position with Multi–Care. Plaintiff sent her application in response to a job advertisement which stated:

> Full-time corporate position for R.N. with the following qualifications: long-term care & acute care exp., *Train the Trainer certification,* organized & self-starter, interest in teaching a professional and non-professional staff, willing to travel within Northeast Ohio area. Please submit resume to: Multi–Care Management, 3659 Green Rd., Suite 320, Beachwood, Ohio 44122.

(Emphasis added). At the time of her application, Kocsis was not "Train the Trainer" certified. She claims, however, that Suzanne White, nevertheless, encouraged her to apply for the position despite the fact that she was not certified. Plaintiff did not receive the corporate nursing position.

Further, Kocsis asserts that Lozenski frequently called Kocsis into her office and subjected Kocsis to unprofessional, hostile, and humiliating treatment.[7] On March 30, 1993, the day after Kocsis was told about her reassignment, she filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC"), alleging that she had been denied a promotion and that she had been demoted because of her disability. In her charge, Kocsis indicated that she was afflicted with arthritis and MS. Dr. Weingart, however, submitted a document to the OCRC indicating that plaintiff had no disabilities or restrictions.

The defendant submitted two handwritten notes by Lozenski which indicated that Lozenski had twice asked Kocsis to provide a statement from her physician regarding Kocsis' condition. The first note, dated April 14, 1993, states: "I asked Linda Kocsis for a statement from her physician stating what diagnosis she has, when the diagnosis was made and if there are any restrictions connected with the diagnosis. She said she would provide this information." The second note, dated two days later, states: "I once again asked Linda for the above stated information. She said she would get it soon. I told her we need this information as soon as possible."

In response, Kocsis submitted two letters from her doctors. The first, dated April 14, 1993, was written by Dr. Andrew C. Raynor, who stated that Kocsis was "followed by [Dr. Raynor] for a diagnosis of fibromyalgia," and that she had no work restrictions at that time. The second, dated April 15, 1993, was from Dr. Weingart and it stated that "Linda Kocsis had a diagnosis of multiple sclerosis." Dr. Weingart also placed no specific restrictions upon Kocsis. The submission of those letters was the first written diagnosis of MS that Kocsis ever gave to the defendant. Later, on November 24, 1994, Dr. Weingart issued another report reiterating his MS diagnosis "with no specific job restrictions."

On May 17, 1993, while still employed with Bath Manor, plaintiff submitted an application at Bridgepark Center for Rehabilitation and Nursing Services. A few days later, Kocsis resigned her employment at Bath Manor and began working at Bridgepark in the position of unit manager at a lesser hourly rate than she had received from defendant.[8]

On May 24, 1994, plaintiff filed the complaint below, alleging violations of the ADA; the Rehabilitation Act, 29 U.S.C. § 790, *et seq.;* the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.;* and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiff alleged that Multi–Care denied her a promotion, demoted her, failed to accommodate her, and that it constructively discharged her because of her disability. The

---

7. In her deposition, however, Kocsis admittedly could not articulate any specific examples of this treatment. *See* Plaintiff's Brief at 9.

8. Plaintiff was working at Bridgepark at the time the district court rendered summary judgment for defendant on her claims.

district court dismissed most of these claims and entered judgment for defendant.[9] The district court found it "questionable" whether Kocsis had pleaded a claim under the Rehabilitation Act of 1973 and did not address that claim. Finally, the district court granted summary judgment as to the remaining claims under the ADA. This timely appeal followed. Although plaintiff's notice of appeal indicates that she is appealing the entire district court judgment, she raises only the dismissal of her ADA claims in her brief on appeal. Accordingly, plaintiff has waived all other arguments. *Boyd v. Ford Motor Co.,* 948 F.2d 283, 284 (6th Cir.1991), *cert. denied,* 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992). We consider on appeal only the ADA and constructive discharge claims.

## II. *DISTRICT COURT'S OPINION*

The district court first construed Kocsis' somewhat confusing complaint as setting forth one count of disability discrimination manifested in three employment actions— failure to promote, demotion, and failure to accommodate—, and one count of constructive discharge.[10] The district court began by granting summary judgment on Kocsis' "failure to promote" claim. The court reasoned that Kocsis could not establish a prima facie case in that regard, because she admitted in her deposition that she did not have a "Train the Trainer" certificate and, thus, was not qualified for the position which she had sought. The fact that Suzanne White had encouraged her to apply, even if true, did not create a genuine issue of material fact as to whether the "Train the Trainer" certificate was required for the position. Indeed, the district court found that the ad in the newspaper clearly indicated that Multi–Care required such a certificate, and that the certificate was required by state law. Therefore, it granted the defendant summary judgment on Kocsis' "failure to promote" claim.

Next, the district court turned to Kocsis' alleged demotion, and began by "presuming," without deciding, that Kocsis had suffered an adverse employment action in her assignment to unit RN from nursing supervisor. The court initially found that Kocsis had stated a *prima facie* discriminatory demotion claim because (1) she was presently under a diagnosis of MS and thus could be considered disabled; (2) she was qualified for the prior supervisor position and yet was removed from it; and (3) she was replaced by a nondisabled person.

The district court then found that Bath Manor had met its burden of articulating a legitimate, non-discriminatory reason for reassigning Kocsis to the unit RN position. In sworn answers to interrogatories and in deposition testimony, Bath Manor set out that the decision to reassign Kocsis had been based solely upon observations and evaluations of Kocsis' performance. The court then found that Kocsis could not show that Bath Manor's proffered reason was a pretext for intentional disability discrimination, because the record showed that Bath Manor never had definite information about Kocsis' MS until around April 15, 1993, well after the allegedly discriminatory demotion had taken place. Multi–Care's vice president of operations, Susan Gregg, testified that "[i]t was my understanding that any change in position was made in absence of any knowledge of any disability." The district court held that "[A]n employer must know about a disability before it can intentionally discriminate against an employee based on that disability. Otherwise it could not be said that the employer discriminated 'because of' the disability." 42 U.S.C. § 12112(a). Although, as the district court noted, Kocsis claimed to have told superiors of her health problems and "suspicions" of MS, the district court deemed it "quite clear that neither plaintiff nor her doctors knew for sure that plaintiff had MS until *after* the employment decision in question in this case."

The court below also rejected Kocsis' argument that, even if Bath Manor did not know she had a disability, Bath Manor should be liable because it *perceived* her as having one, given its knowledge of her health problems.

**9.** The district court dismissed Kocsis's § 1981, § 1983, and Title VII claims for failure to state a claim upon which relief can be granted.

**10.** We agree with the district court's assessment of the claims alleged in Kocsis' complaint.

According to the district court, "[t]his is too great a leap into the unknown. The fact that an employee is generally sickly or possesses a constitution that is prone to illness is not enough to bring that employee within the protection of the ADA," citing *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928 (7th Cir.1995).

Next, in Kocsis' "failure to accommodate" claim, the district court granted the defendant summary judgment because Kocsis never sought any accommodations. The court quoted her deposition testimony in which Kocsis firmly stated that she had no physical limitations and that she never requested any accommodations from the defendant. Therefore, the court also granted the defendant summary judgment on that claim.

With respect to Kocsis' claim of constructive discharge, the court found that Kocsis failed to present any specific evidence that she had been subjected to working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Easter v. Jeep Corp.*, 750 F.2d 520, 522–23 (6th Cir.1984). In her deposition testimony, Kocsis failed to point out any specific incidence of the conduct about which she complained. Finding no evidence in the record to support Kocsis' claim other than the general allegations, the court awarded summary judgment in favor of the defendant on the claim of constructive discharge.

## III. SUMMARY JUDGMENT STANDARD

■ Kocsis argues that the district court erred in granting defendant's motion for summary judgment. We review a district court's grant of summary judgment de novo. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 250 (6th Cir.1994). When reviewing a motion for summary judgment, the evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993,

994, 8 L.Ed.2d 176 (1962) (per curiam)). Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## IV. ANALYSIS

### A. Applicable Provisions of the ADA

The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1995). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). An individual is considered to have a "disability" if either (1) she has an impairment that substantially limits one or more of her major life activities; (2) there is a record of such an impairment; or (3) she is regarded by her employer as having such an impairment. *Id.* § 12102(2).

■ Under the established framework for deciding discrimination cases set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a plaintiff establishes a prima facie case of disability discrimination if she proves that (1) she was "disabled" within the meaning of the Act; (2) she was qualified for the position, with or without an accommodation; (3) she suffered an adverse employment decision with regard to the position in question; and (4) a non-disabled person replaced her or was selected for the position that the disabled person had sought. *See Maddox v. University of Tennessee*, 62 F.3d 843, 846 (6th Cir.1995) (applying similar analysis to

Rehabilitation Act and ADA claims); *see also Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156–57 (3d Cir.1995) (collecting cases holding that Title VII analysis applies to ADA claims). If the plaintiff establishes the elements for a prima facie case, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant carries that burden of production, plaintiff must then prove "by a preponderance of the evidence" that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). More specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1083 (6th Cir.1994).

■ To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action. *Id.* at 1084 (quoting *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir.1993)). At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

We now apply the above legal standards to the facts of the instant case.

## B. Discrimination Claims—Failure to Promote, Demotion, and Failure to Accommodate

■ We first note that Kocsis' "failure to accommodate" claim is, to some extent, interwoven with her "failure to promote" and "demotion" claims. Where appropriate, we will address the "failure to accommodate" claim in the discussion of the other issues. As a separate matter, however, Kocsis' "failure to accommodate" claim must fail. The district court correctly noted that Kocsis firmly stated in her deposition that she never requested any accommodation from the defendant. She testified several times that she was physically capable of performing the duties of the nursing supervisor and the unit RN. Moreover, Kocsis' doctors reported that she was not limited in her activity and that she, consequently, did not need any accommodations. Therefore, we affirm summary judgment for the defendant on the "failure to accommodate" claim essentially for the reasons stated by the district court.

■ Next, Kocsis claims that the defendant illegally "failed to promote" her, *i.e.,* failed to hire her for the corporate nursing position, because of her disability. Again, we find that the district court was correct in its analysis on this issue. Kocsis was aware that having a "Train the Trainer" certificate was a written requirement for anyone seeking the position. She has introduced no evidence to show that having such a certificate is not a genuine prerequisite of the position she sought. The oral representations of Suzanne White, even if true, are not sufficient to create a genuine issue of material fact on this question. Therefore, we affirm summary judgment for the defendant on Kocsis' "failure to promote" claim.[11]

Kocsis' "demotion" claim, in our view, also fails for several reasons. As is explained above, the district court granted summary judgment in favor of the defendant on this claim because, although Kocsis stated a prima facie case of discriminatory demotion, the defendant successfully articulated a non-discriminatory reason for the demotion. Because Kocsis did not produce sufficient evidence to show that the articulated reason

---

11. To the extent that Kocsis claims that hiring her for the corporate nursing position would have been a "reasonable accommodation," we reject her argument. Kocsis was admittedly able to perform her duties as nursing supervisor (and unit RN). The fact that she may have preferred to have the corporate nursing position would not trigger any duty on the part of the defendant to "accommodate" Kocsis' preference.

may have been a pretext for discrimination, the court found in favor of the defendant.

We agree with the district court that the defendant cannot discriminate "because of" a disability if it has no knowledge of the disability. *See Hedberg*, 47 F.3d at 932–34; *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1181 (6th Cir.1993) (under Rehabilitation Act of 1973, employer cannot discriminate on the basis of a mental disability when employer had no knowledge of such disability); *accord, Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir.1996) (no recovery under ADA when prospective employer had no actual knowledge of applicant's disability); *Miller v. National Cas. Co.*, 61 F.3d 627, 630 (8th Cir.1995) (no relief under the ADA when employer did not know that employee had a manic depressive condition). We disagree, however, with the district court's finding that Kocsis established, in the first instance, a prima facie case of disability discrimination.[12]

In order to recover on any of her ADA claims, Kocsis must first establish as part of her prima facie case that she was a "qualified individual with a disability" *at the time of the discriminatory act*.[13] To show that she had a "disability," Kocsis must establish that she had an impairment that substantially limited her major life activities, that she had a record of such an impairment, or that she was perceived as having such an impairment.

First, Kocsis testified in her deposition that none of her impairments—arthritis, MS, or any combination of health problems—limited her activity in any way.[14] By her own admission, therefore, she does not have an impairment that limits her major life activities. Although both arthritis and MS can be disabling in some instances, they were not so substantially limiting in this case.[15] Also, there is no evidence that a record of such an impairment existed at the time of Kocsis' reassignment in March of 1993. Therefore, Kocsis does not have a "disability" under either of the first two prongs of the definition.

As is noted above, an "individual with a disability" also includes persons who have impairments that are not substantially limiting, but who are regarded by their employer as being substantially limited. The applicable regulations provide that there are three ways in which a plaintiff can show that she is "regarded" as having a disability:

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer ... as constituting a substantially limiting impairment;

(2) the individual may have an impairment which is only substantially limiting because

12. The district court reasoned that the defendant's lack of knowledge was relevant at the burden-shifting stage of the ADA analysis. At least one court, however, has specifically held that the employer's absence of knowledge was fatal at the prima facie stage. *See Morisky*, 80 F.3d at 448 (no prima facie case under ADA absent proof that the defendant had actual knowledge of the applicant's disability). In the instant case, we need not determine the stage at which the defendant's lack of knowledge is relevant, because Kocsis' demotion claim would fail at either stage.

13. The district court found that Kocsis could satisfy the "disability" requirement for purposes of establishing her prima facie case because she was *"presently* under a diagnosis of [MS]." (Emphasis in original). That premise is erroneous, however, because Kocsis must establish that her disability existed *at the time of the discriminatory act. See, e.g., McDaniel v. Mississippi Baptist Medical Center*, 877 F.Supp. 321, 326 (S.D.Miss.) (plaintiff must be a "qualified individual with a

disability" at the time the adverse action occurred), *aff'd*, 74 F.3d 1238 (5th Cir.1995); *Parker v. Metropolitan Life Ins. Co.*, 875 F.Supp. 1321, 1326 (W.D.Tenn.1995) (when alleged disability did not exist at the time of the "job action in question," plaintiff did not have standing to sue under the ADA).

14. In the record, there is evidence of a longstanding hearing problem that is described as "worsening." There is, however, no claim of any *hearing disability*.

15. Kocsis does not argue that either arthritis or MS is inherently disabling. *See* 29 C.F.R. § 1630, App. B, § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.... Other impairments, however, such as HIV infection, are inherently substantially limiting.").

of the attitudes of others toward the impairment; or

(3) the individual may have no impairment at all but is regarded by the employer ... as having a substantially limiting impairment.

29 C.F.R. § 1630, App. B, § 1630.2(*l*). That definition of disability "is designed to protect against erroneous stereotypes some employers hold regarding certain physical or mental impairments that are not substantially limiting in fact." *Schluter v. Industrial Coils, Inc.*, 928 F.Supp. 1437, 1448–49 (W.D.Wis. 1996). Under that provision, a "plaintiff must show that the perceived impairment is a substantial limitation on a major life activity." *Id.* at 1449; *accord Byrne v. Board of Education*, 979 F.2d 560, 567 (7th Cir.1992) ("an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job," quoting *Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir.1986)).

Kocsis argues that the evidence was sufficient for a reasonable jury to find that the defendant regarded or "perceived" her as having a substantially limiting disability. She points to the fact that her superiors knew that she was having health problems and that Kocsis suspected that she had MS. From this knowledge, Kocsis argues, the defendant viewed her activities as being substantially limited. In our view, however, there is virtually no evidence to support that position. Kocsis' performance evaluations reveal that the defendant was aware of her health problems, lack of energy, and mood swings. While the defendant may have perceived that Kocsis' health problems were adversely affecting her job performance, there is no evidence that defendant regarded Kocsis as being unable to care for herself or to perform all of the duties of her job. Therefore, Kocsis cannot establish that she had a disability under the "regarded as" prong of the definition.

▮ Assuming, however, that Kocsis could establish that she had a disability under the ADA, she would still be required to show, as part of her prima facie case, that the employer's actions about which she complains were "materially adverse." *See Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994); *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987); *Cherry v. Thermo Electron Corp.*, 800 F.Supp. 508, 511 (E.D.Mich.1992); 42 U.S.C. § 12112(a). Specifically, Kocsis must show that her reassignment to unit RN was a materially adverse change in the terms of her employment. With respect to this issue, we refer to analogous cases decided in the context of age and sex discrimination, because cases involving the ADEA and Title VII are instructive in cases involving the ADA.

This court has held that reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims. *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987). In *Yates*, the plaintiff sued her employer, alleging that it retaliated against her for engaging in protected activities. The allegedly adverse action involved requiring the plaintiff to sign an agreement with her employer as a condition to being promoted. The court found that the employer's requirement was not an adverse action, noting particularly that the plaintiff received no pay or benefits reduction. *Id.* (citing *Ferguson v. E.I. duPont deNemours and Co.*, 560 F.Supp. 1172 (D.Del.1983)).

In *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir.1989), the Seventh Circuit held that the ADEA requires the plaintiff to prove "that she suffered a *materially adverse* change in the terms or conditions of her employment because of her employer's conduct." *Spring*, 865 F.2d at 885 (emphasis in original). In *Spring*, the plaintiff was a school principal who, as part of a district-wide reorganization plan, had been transferred to a dual-principalship position that she claimed was generally perceived by the public as a "nudge towards retirement." In the new position, however, she received a new employment contract and a merit pay increase. *Id.* at 886. The court found that the plaintiff's order of proof showed that the new position actually seemed more advantageous if not easier to perform, and the staff size remained the same. *Id.* The court summarily dismissed the "public

perception" argument by noting that the public's perception of the job or transfer was not a term or condition of employment. *Id.* The court concluded that the reassignment "was not a materially adverse change in the terms or conditions of her employment." [16] *Id.*

In a later case, the Seventh Circuit fleshed out the standard advanced in *Spring,* stating that a "materially adverse" employment action might be indicated if an employee received *"significantly diminished* material responsibilities," and would therefore potentially raise a genuine issue of material fact. *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) (emphasis added).[17] The plaintiff in *Crady,* a bank officer, had been transferred from one division of the bank to another, but simply failed to offer any proof that his responsibilities were any less significant even though they were different. *Id.* The court listed certain factors to consider in determining whether an employment action was materially adverse: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* The court also stated that a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Although the plaintiff's new title did not carry the "Assistant Vice–President" designation of his former position, the court found that the change was not "materially adverse." *Id.; accord, Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir.1994) (a semantic change in title and a "bruised ego" were not enough where pay and benefits remained the same); *see also Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994) ("changes in ... working con-

ditions that cause no *materially significant disadvantage* ... are insufficient to establish the adverse condition required." (Emphasis added)).

In the constructive discharge context, this court has affirmed a Kentucky district court which stated the general rule that, "[b]arring unusual circumstances, ... a transfer at no loss of title, pay, or benefits does not amount to ... [an] adverse employment action." *Darnell v. Campbell County Fiscal Court,* 731 F.Supp. 1309, 1313 (E.D.Ky.1990), *aff'd,* 924 F.2d 1057 (6th Cir.1991). In *Darnell,* the plaintiff, a county employee, received a transfer to a job with the same duties, pay, and grade level, but the new position was in another County office that was a 20–minute drive further than the original job. The plaintiff argued that the required additional driving time converted the transfer to a constructive discharge. In deciding that the transfer was not a materially adverse employment action, the court reasoned that "the two jobs were the same in terms of salary, duties, etc. and ... the [20–minute additional drive did] not impose an onerous burden." *Id.* at 1313; *accord, Kelleher v. Flawn,* 761 F.2d 1079, 1086 (5th Cir.1985) (a plaintiff's "subjective impressions as to the desirability of one position over another" is not controlling). The district court considered whether plaintiff had tried the new position so as to experience and compare any claimed unfavorable or harmful effect in comparison to the old position. The court held that "plaintiff ha[s] the obligation to give it a try and could not speculate that the defendant was acting in bad faith." *Darnell,* 731 F.Supp. at 1312.

We conclude that Kocsis has not suffered a materially adverse employment action. In her new job as unit RN, she enjoyed the same (or a greater) rate of pay and benefits, and her duties were not materially modified. She submitted no evidence that she lost any

---

**16.** In reviewing the district court's grant of summary judgment for the employer, the court reasoned that "[a]lthough we must ... draw any inferences in favor of [the plaintiff], we are not required to draw every conceivable inference from the record. We need draw only reasonable ones." *Id.* at 886.

**17.** *Crady* cited *Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 422 (7th Cir.1989), where a plaintiff prevailed over defendant's summary judgment motion even though he retained his salary and benefit when transferred to a lesser job. *Weihaupt,* 874 F.2d at 422 (emphasis added). In *Weihaupt,* however, the employer conceded that the transfer was a "demotion."

prestige in her position because of her working conditions or her title change. Also, Kocsis failed to make a real attempt to compare the two positions before she filed her discrimination claim. Her immediate challenge of the transfer as a reflection of disability discrimination was premature. We agree with those courts who have required such a plaintiff to demonstrate as part of a *prima facie* case a showing of materially adverse conditions imposed by the employer. In our opinion, plaintiff has failed to make out such a case in her demotion claim, and summary judgment was appropriate for defendant on that basis.

## C. Constructive Discharge

 Finally, we agree with the district court's decision to grant summary judgment in favor of the defendant on Kocsis' claim of constructive discharge essentially for the reasons expressed in that decision. During her deposition, Kocsis testified to the antagonism and hostility that was inflicted by the defendant. She could not describe one specific instance, however, of such conduct. In order to maintain an action for constructive discharge, Kocsis must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982) (quoting *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980)), *quoted in Easter v. Jeep Corp.*, 750 F.2d 520, 522–23 (6th Cir.1984). As the district court stated, "[t]here is simply nothing on this record to show that the defendant constructively discharged the plaintiff. Rather, the record shows that she simply made a personal decision to change employment." Kocsis' unsupported accusations of antagonistic, hostile conduct on the part of the defendant does not create a genuine issue of material fact with regard to this claim.[18] Under those circumstances, we find that there was no "constructive discharge" as a matter of law.

18. Furthermore, Kocsis' reassignment to the unit RN position did not amount to a constructive discharge because, as we found earlier in this opinion, that reassignment did not constitute a materially adverse change in Kocsis's working conditions. *See Darnell*, 731 F.Supp. at 1313.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of the defendant.