[UNPUBLISHED]
File Name: 05a0979n.06
Filed: December 14, 2005

No. 04-5874

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Maralyn S. James, | ) | |
| | ) | |
|     Plaintiff-Appellee, | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Metropolitan Government of Nashville | ) | |
| and Davidson County Nashville Public | ) | |
| Library, | ) | |
| | ) | **OPINION** |
|     Defendant-Appellant. | ) | |
| _____ | ) | |

**Before: GILMAN and COOK, Circuit Judges, and MILLS, District Judge.**[*]

**RICHARD MILLS, District Judge.**

## I. HISTORY

The Metropolitan Government of Nashville and Davidson County operates the Nashville

Public Library (collectively "the Government"). Maralyn James began working for the Library

in 1971 as a "Librarian I," acquiring records, raising funds, cataloguing materials, and

performing other tasks. From 1971 to 1994, James received performance ratings primarily of

_____

[*] The Honorable Richard Mills, United States District Judge for the Central District of
Illinois, sitting by designation.

1

"outstanding" and "above average."

In 1994, the Library transferred James to its main branch and promoted her to "Librarian I-and-a-half." In 1996, James received a negative performance evaluation with respect to the speed of her work. She knew that she was not cataloguing materials as quickly as her coworkers.

In July 1999, James became a "Librarian II" via a reclassification of library job titles. Her responsibilities remained unchanged and the speed of her work remained unsatisfactory. Performance evaluations from 1996 through 2001 consistently criticized James' output. For instance, James' 1999 performance evaluation noted that she was cataloguing "just over 2 titles per hour (as opposed to the 7-8 expected) . . . Continued low output in her primary job responsibility is not acceptable and will have serious consequences if the situation is not corrected."

On October 1, 2001, James' supervisor, Linda Neff, gave James a deadline to catalogue a collection of books. James considered the deadline unfair and the resulting stress led her to seek medical attention for headaches and high blood pressure. James' doctor, Michael Callaway, M.D., advised her to take several days off work. He also sent the Library a letter notifying it that James was "to limit stress at work, specifically no overtime and working at a pace consistent with her abilities due to her medical condition." Dr. Callaway later diagnosed James as having "mild cognitive dysfunction relating to stress at work."

On October 3, James wrote a letter complaining that she was being subjected to "harassment" and a "hostile work environment." James requested a transfer because the hostility was detrimental to her health. One of the letter's recipients, Library Director Donna Nicely, called James into her office on October 9 to discuss James' complaint. Supervisors Suliang Feng

2

and Chase Adams were present at the meeting. Adams told James "if you will just volunteer to take a demotion, this will all be over with." James did not volunteer to take a demotion and the Library did not approve her transfer. The Library investigated her complaint and on October 31, 2001, concluded it had no merit.

By the end of 2001, James' poor productivity caused her to fail an annual evaluation. The Library advised James that she would be fired if her productivity did not improve. On January 29, 2002, James filed an EEOC charge against the Government alleging age discrimination, disability discrimination, and retaliation. She received a "right to sue letter" on January 31, 2002. That same day, James submitted a letter seeking a lateral transfer to "Librarian II-audio visual." Despite being ranked first on the list of applicants, James did not receive an interview.

The Library scheduled a performance re-evaluation for James on March 1, 2002, but the re-evaluation was postponed for a month at James' request. By April 1, James was unable to catalogue an average of 6 items per hour, a goal the Library had given her. The Library did not discipline James. Instead, it gave her time to improve her productivity and offered to assist her in that regard. To that end, the Library accommodated James' request to adjust lights around her computer and provide her with special computer glasses. The Library also offered techniques for James to improve her output.

James filed a second retaliation claim with the EEOC and received a "right to sue" letter on April 16, 2002. She sued the Library and the Metropolitan Government of Nashville and Davidson County on April 30, 2002.

The Library gave James until May 16, 2002, to increase her catalogue average to 6 items

3

per hour.  By May 9, James was averaging 5.75 items per hour.  However, on May 13, 2002, James' neurologist, Dr. Alan Bachrach, informed the Library that James could not return to her job because she could not keep up with the quotas.  That same day, James wrote the Government's benefits department to say that if the Library did not accommodate her with a position at her current level of Librarian II, she would apply for a disability pension.

In June 2002, the Library offered to transfer James to a Librarian I position.  James refused the demotion and applied for a disability pension.  On November 19, 2002, the Library informed James that if she did not accept a demotion she would be charged as absent without leave and subject to disciplinary action.

The Library informed the Benefits Board that it "offered to accommodate [James] at a lesser position with current salary."  However, the Library did not disclose that the salary for the lesser position would, after three months, be reduced to a level that was less than James' Librarian II salary.  Because the Library said it could accommodate James, the Benefits Board rejected her claim for a disability pension on April 2, 2003.  James sought reconsideration, which was also denied.

James received her last paycheck in March 2003.  When she noticed that her family health insurance premium had not been deducted, she immediately notified the Government.  James took a $209.20 personal check to the Government's payroll department to pay her premium.  She continued to make payments each month her disability pension appeal was pending.  In late July 2003, James received a letter from CIGNA cancelling her family health insurance due to non-payment of premiums.  However, the letter was a mistake and the insurance was never cancelled.  She took an early service pension and terminated her employment on or

4

about March 1, 2003.

James sued the Government on April 30, 2003, alleging claims under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12111, *et seq.*, the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. The district court dismissed the ADA and ADEA claims on summary judgment and James proceeded to trial on her Title VII hostile work environment and retaliation claims. On May 14, 2003, the jury found the Government liable for retaliation and awarded James $42,000 in compensatory damages. The Government moved to have the verdict set aside under Federal Rule of Civil Procedure 50(a), claiming that the evidence did not show that James had suffered an adverse employment action. The district court denied the Government's motion.

## II. STANDARD OF REVIEW

This Court reviews a district court's denial of a motion for judgment as a matter of law *de novo*. Estate of Riddle ex rel. Riddle v. Southern Farm Bureau Life Ins. Co., 421 F.3d 400, 408 (6th Cir. 2005). The Court views the evidence in the light most favorable to the nonmoving party. Gray v. Toshiba Am. Consumer Prods., Inc., 263 F.3d 595, 598 (6th Cir. 2001). It will affirm the jury's verdict unless there was "no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party." See Fed.R.Civ.P. 50(a).

## III. ANALYSIS

"In an action under Title VII, the plaintiff may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework." Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003) (referring to McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). To

5

do this, a plaintiff must prove that: (1) plaintiff engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took an adverse employment action against the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. See Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis in original) (citations omitted). "If and when a plaintiff has established a prima facie case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. (quoting McDonnell Douglas, 411 U.S. at 802). The plaintiff must then demonstrate "that the proffered reason was not the true reason for the employment decision." Id. (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The employer may also prove an affirmative defense to retaliatory harassment by a supervisor by demonstrating: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

### A. Adverse Employment Actions

"An adverse employment action is a 'materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct.'" Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir.2002) (citation omitted). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage

6

or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Ford v. Gen. Motors Corp., 305 F.3d 545, 553 (6th Cir. 2002) (citation omitted); see also Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996). A change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Kocsis, 97 F.3d at 886 (citation omitted). *De minimis* employment actions, such as "[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." Policastro, 297 F.3d at 539.

At trial, James produced evidence of various harms the Government allegedly caused her (*i.e.*, denial of lateral transfers, bad employment evaluations, imposition of cataloguing quotas, etc.). Those harms are not adverse employment actions. See Sherman v. Chrysler Corp., 47 Fed.Appx. 716, 721-22 (6th Cir. 2002) (unpublished)(denial of lateral transfer is not an adverse employment action under the ADEA); Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999) (an unfavorable evaluation without an accompanying adverse employment action, such as a lower wage, is not actionable as a Title VII retaliation claim); Agnew v. BASF Corp., 286 F.3d 307, 10 (6 th Cir. 2002) (requiring an employee to comply with a reasonable performance plan or be subject to discipline does not constitute an adverse employment action under the ADEA).

James also contended that the Government's opposition to her disability application, the "cancellation" of her family's health insurance, its "misrepresentation" about paying her the same salary to work a lesser position, and the reduced service pension it paid her are adverse

7

employment actions.[1]  James is incorrect in all respects.

In the present case, the Library's failure to support James's disability application was not an adverse employment action because it did not cause a material change in her benefits.  And while James claimed that the Government misrepresented that it offered her a lesser position with current salary as an alternative to her seeking disability, the record shows that James informed the Benefits Board that her salary would be slightly lower if she accepted the lesser position.  The Board's decision to deny James a disability pension despite the discrepancy shows that the Government's "misrepresentation" did not affect the Board's decision.  Thus, James suffered no adverse employment action via the alleged misrepresentation or cancellation.

James also failed to show that her family's insurance was cancelled.  The testimony showed that an insurance company (not the Government) sent James a letter cancelling her family's health insurance.  However, the letter was a mistake and the insurance was never cancelled.

The closest James came to establishing an adverse employment action was when she alleged that the Government reduced her service pension.  Prior to James' retirement, John Kennedy, the Government's Assistant Director of Human Resources, provided James a chart showing that her pension would be $1,803.66 per month if she ended her service on March 1, 2003, at age 55 and a half.  James ended her service at that time, but her monthly pension turned out to be $1,506.06.  Although James contended that the smaller pension was evidence of

---

[1]  Although these events occurred after James left the workplace, post-employment injuries can be actionable under Title VII.  See Robinson v. Shell Oil Co., 519 U.S. 337, 339, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (holding that the term "employees," as used in Title VII's anti-retaliation provision, includes former employees bringing suit for retaliatory, post-employment actions, such as a negative reference to a potential employer).

8

retaliation, the chart plainly explained that any person who retired before reaching age 60 would have his or her pension reduced by 4% per year. Thus, James' pension was reduced to $1,506.06 per month because she retired early. It was not reduced due to retaliation. Even if the chart was somehow unclear or wrongly explained, James never contended that the Government used the chart to fraudulently induce her retirement and she never argued that she detrimentally relied on the chart.

### B. Severe or Pervasive Retaliatory Harassment by a Supervisor

Alternatively, James argues that the jury could have returned a verdict in her favor based on severe or pervasive retaliatory conduct. Evidence of severe or pervasive supervisor harassment following a discrimination complaint can constitute retaliation for purposes of Title VII. See Morris, 201 F.3d at 792. The standard for severe or pervasive harassment is the same in the retaliation context as in the sexual and racial discrimination contexts. Akers v. Alvey, 338 F.3d 491, 498 (6th Cir. 2003) (citation and quotation marks omitted). Under this standard, the harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "[T]his test has both an objective and a subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive." Id. (citation omitted).

The Morris decision provides context for the "severe or pervasive harassment" standard. There, plaintiff Judy Morris filed a sexual harassment complaint against her supervisor, Brent Likins, for sexual harassment. See Morris, 201 F.3d at 787. In retaliation, Likins began calling

9

Morris and visiting her workplace to harass her. He drove to her office building on several occasions and sat in his truck looking in her work window, "making faces at her." Id. at 793. Once, he even followed her home from work, drove up to her mailbox, and gave her "the finger." Id. He destroyed the television Morris watched at work, and threw roofing nails on her home driveway several times. In light of those facts, this Court held that "a reasonable juror could conclude that Likins's behavior after the lodging of Morris's complaint constituted severe or pervasive retaliatory harassment." Id.

The only evidence James offers to show "severe or pervasive harassment" is the Government's opposition to her disability benefits application and "cancellation" of her health insurance. Because the Government was not responsible for the mistaken cancellation letter James received, the only action James can complain about is the Government's opposition to her benefits application. That opposition is not even close to the conduct present in Morris. Thus, as an objective matter, the Government's opposition to James' benefits application was not "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."

## IV. CONCLUSION

James did not present evidence sufficient for a jury to find in favor of her retaliation claim. We therefore REVERSE the district court's decision to deny the Government's Rule 50 motion and remand for proceedings consistent with this opinion.