ZATKOFF, District Judge,
Concurring in Part and Dissenting in Part.
I concur with the factual description, analysis and conclusions set forth in Sections I., H.A., II.B., II.D. and II.F of Judge Gilman’s opinion. As such, I join with my colleagues in affirming the district court’s judgment with regard to Spees’s pregnancy-discrimination claim and her disability-discrimination claim as they pertain to the termination of her employment. I disagree, however, that Spees suffered an adverse employment action when she was transferred to the tool room. Accordingly, I write separately and respectfully dissent from the majority’s decision to reverse the district court’s judgment on Spees’s pregnancy-discrimination and her disability-discrimination claims as they pertain to her transfer to the tool room.
As stated by the majority in Section II.C.l.:
An adverse employment action has been defined as “a materially adverse *400 change in the terms and conditions of [a plaintiffs] employment.” White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795 (6th Cir.2004) (en banc) (citation omitted). A “bruised ego” or a “mere inconvenience or an alteration of job responsibilities” is not sufficient to constitute an adverse employment action. Id. at 797. Adverse employment actions are typically marked by a “significant change in employment status,” including “hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” Id. at 798 (quoting Burlington Indus. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).
Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by “salary or work hour changes.” See Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885-86 (6th Cir.1996) (holding that a job transfer was not an adverse employment action because the plaintiff “enjoyed the same .... rate of pay and benefits, and her duties were not materially modified”). And even if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received “a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.” Id. at 886 (citation omitted).
The majority also recognizes that “[t]he third element' [of a disability-discrimination claim] requires that a plaintiff suffer an adverse employment action.” Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1105 (6th Cir.2008).
I find the foregoing recitation of the law accurate and applicable in this case, just as I agree with the majority’s conclusion that:
Some evidence indicates that the transfer was not a materially adverse change in her employment. For instance, Spees received the same salary while working in the tool room and did not lose any of her benefits. And, as JMI points out in its brief, the working conditions in the tool room were in some ways better than those while welding. JMI contends, for example, that the summer heat was more tolerable in the tool room because Spees could wear two fewer pieces of gear than when welding, and JMI provided a small fan for Spees’s personal use. Spees was also not subject to the toxic fumes from welding while working in the tool room.
Nonetheless, the majority ultimately concludes that “Spees’s transfer to the tool room resulted in her working in a more inconvenient shift in a position that was less challenging and that required fewer qualifications!,] • • • [such that] a reasonable jury could find that her transfer to the tool room constituted an adverse employment action.”
I am not persuaded that any of those reasons (i.e., inconvenience to Spees, a less challenging position and fewer required qualifications), individually or in the aggregate, could support a finding that Spees suffered an adverse employment action when she was transferred to the tool room. Most significantly, Spees was not subject to “salary or work hour changes!,]” she “enjoyed the same ... rate of pay and benefits, and her duties were not materially modified.” Kocsis, 97 F.3d at 885-86. Although the tool-room position did not require any specific training, as the welding position did, I do not believe that difference suffices to enable a reasonable jury to find Spees suffei*ed an adverse *401 employment action. This is particularly true because Spees was a “welder-trainee” and that title does not carry any greater prestige than the tool room position Spees assumed upon her transfer.
The majority notes that Spees felt unchallenged in the tool room and found the tool room work “more boring” than welding. Likewise, the majority notes, “Spees did not describe in detail how the schedule change affected her, [but] she did state that she ‘wasn’t happy’ about transferring to nights because she was a single mother.” Spees’s unhappiness with the change to the night shift and the fact that she felt unchallenged and “more bor[ed]” by the tasks she performed in the tool room, while not irrelevant to her, reflect a “mere inconvenience” and not a “significant change in employment status.” White, 364 F.3d at 797-98. Rather, those feelings are more indicative of a “bruised ego” than a “significant change in employment status.” Id. In addition, it is undisputed that Spees approached Pam DeWeese, an employee in JMI’s Human Resource Department, about changing to the night-shift position (although this apparently was done after Tony Milam, her foreman, indicated that such a transfer would allow Spees to maintain her employment during the pregnancy).
Finally, I disagree with the majority’s conclusion that the evidence does not “conclusively indicate that the tool-room position was a more pleasant working environment” as it pertained to heat and the physical demand on Spees. The evidence, in fact, did conclusively establish that the tool-room position offered a more pleasant working environment. As the majority recognizes, “welders are exposed to fumes, dust, and organic vapors in the course of them work[,]” and, in order to limit the inhalation of those substances, JMI provides welders with respirators to wear while on the job (though Spees often opted not to wear it while working as a welder because she “didn’t feel like [she] needed one”). Such conditions are not present in the tool room, and there is no need for a respirator to work in the tool room. Welding work requires climbing up ladders and stairs, maneuvering into barge tanks and occasionally overhead handling of equipment, none of which was required to work in the tool room. Welders also wear a welding helmet and welding gloves, neither of which are necessary to work in the tool room. In addition, working in the tool room did not require Spees to work in a confined space, as the welding position often necessitated, and, unlike the welding jobs, the tool room had a fan. All of these differences are significant, particularly when temperatures reached 100 degrees Fahrenheit or more on multiple occasions diming the summer Spees worked for JMI.
For the foregoing reasons, I conclude that Spees did not suffer an adverse employment action when she was transferred to the tool room. Therefore, as a matter of law, Spees cannot prevail on her pregnancy-discrimination claim or her disability-discrimination claim with respect to her transfer to the tool room. Accordingly, I would affirm the judgment of the district court as it pertains to Spees’s pregnancy-discrimination and disability-discrimination claims with regard to her transfer to the tool room.