**Deborah A. BARRETT, Plaintiff–Appellant,**

v.

**LUCENT TECHNOLOGIES, INC., Defendant–Appellee.**

No. 00–4458.

United States Court of Appeals, Sixth Circuit.

June 6, 2002.

Before GUY and BATCHELDER, Circuit Judges; and COHN, District Judge.*

PER CURIAM.

Plaintiff, Deborah A. Barrett, appeals from the entry of summary judgment in favor of defendant, Lucent Technologies, Inc., on her claim of retaliation under the Americans with Disabilities Act (ADA). 42 U.S.C. § 12112(a). After a review of the record, the applicable law, and the arguments presented on appeal, we affirm.

I.

Plaintiff is an African–American who suffers from Lupus and hypertension. She was employed as a reference librarian at AT & T, Lucent's corporate predecessor, in August 1989. In 1995, plaintiff chose to assume a supervisory position after Lucent decided to close the library. Her supervisor was Willie Keaton.

In late 1995, plaintiff was made responsible for coordinating overtime scheduling and expenditures. Plaintiff failed to keep adequate records. This resulted in an unbalanced overtime pool. Lucent had to pay $12,000 in unearned overtime wages in response to a Union complaint. After this incident, Keaton removed plaintiff from this assignment.

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

838

In 1996, Plaintiff was assigned to administer attendance records and time sheets for a group of clerical employees. She did not accurately record attendance and absences. She also did not implement disciplinary steps for employees who violated attendance rules. Keaton offered plaintiff the assistance of his secretary in performing these duties, but plaintiff refused. When she continued to fail to keep accurate attendance sheets, plaintiff was removed from this assignment.

In September 1996, plaintiff first complained about Keaton's treatment of her. Plaintiff states in her affidavit that she told Denise Vines, from Lucent's EEO office, that she "had [L]upus and that Keaton was discriminating and harassing [her] because of it."

Plaintiff was next assigned to supervise the mail room. In early April 1997, Keaton and plaintiff observed the mail room operations. Keaton decided the mail room employees were unproductive. In lieu of decreasing the number of employees, they decided to increase mail deliveries from once a day to twice a day. Keaton participated in many meetings with plaintiff and others, including the U.S.Postal Service, to resolve logistical issues. On May 28, 1997, Keaton met with plaintiff to discuss why the new mail delivery schedule had not been initiated. Keaton and plaintiff describe the meeting as heated with both claiming extreme hostile behavior on the part of the other. The meeting ended when plaintiff refused to talk further with Keaton and left the meeting.

Plaintiff claims that on that same day she again talked to Denise Vines from Lucent's EEO office. She "reported [her][L]upus and discrimination and harassment by Keaton." The next day plaintiff began a three-week sickness absence.

On June 16, 1997, plaintiff met with Ron Young, Keaton's supervisor. In her deposition, plaintiff described the meeting as follows:

I told him that I was still on disability and I suffer from Lupus and hypertension. And I really wanted to get better and wanted to come back to work, but I wanted my work environment to be non-hostile. And I felt it was contributing to me being sick. I had never been out on long-term disability before that extended this long. And I was feeling uncomfortable about it. I wanted to return to work. I wanted to transfer to another supervisor because of Willie's treatment of me.

In her affidavit, plaintiff stated:

In June 1997, I reported to Ronald Young, Willie Keaton's supervisor, that I was on disability leave because I was suffering from Lupus and hypertension. I told him about Keaton's abusive behavior which included screaming, yelling, being singled out and demeaning remarks. Keaton's behavior was exacerbating my Lupus and hypertension. He was intentionally trying to exacerbate [my] lupus. My lesions were clearly visible on my face and they would have been seen by Mr. Young. I told Ronald Young that I wanted a non-hostile work environment. I also told him that I wanted to return to work and receive a transfer to a new supervisor. I wanted to be treated like a human being. I requested his help. I never heard from Ronald Young again.

Young prepared a memorandum three days after the meeting. He stated that plaintiff claimed she was on disability leave because of stress caused by Keaton's treatment of her. She claimed that "Keaton's treatment of her is abusive, disrespectful and harassing." Young wrote that plaintiff stated that Keaton treated other super-

visors in a similar manner. She offered as a solution that she report to someone other than Keaton.

After the meeting, Young questioned Keaton about plaintiff's allegations. Keaton prepared a report to Young describing plaintiff's performance problems. Young spoke with the medical director of Lucent's Columbus facility, Dr. Napoleon V. Carandang, about Lupus. Young also spoke with Lucent's employee assistance program coordinator and with Denise Vines from Lucent's EEO office. Young learned that Bill Kaser, from Lucent's human resource office, had been notified about plaintiff's situation. Young decided to let these offices deal with plaintiff's allegations regarding Keaton.

Kaser and Keaton thereafter decided to place plaintiff on a Performance Improvement Plan (PIP). Lucent's EEO and human resources offices believed that plaintiff's problems with Keaton were caused by plaintiff's unwillingness to perform her job and her refusal to accept Keaton's offered assistance. A PIP was used by Lucent to give an employee an opportunity to improve the skills required in his position. The employee performed the same job and received no decrease in salary or benefits. It was, however, a 90–day probationary period that could result in discharge if not successfully completed. In addition, an employee on PIP could not transfer to another position within Lucent before satisfactory completion of the PIP program.

On July 8, 1997, Keaton and Marcia Walker, from Lucent's EEO office, met with plaintiff to present the PIP. Once again plaintiff and Keaton became hostile to one another. At one point, plaintiff refused to talk to Keaton, and Keaton threatened to suspend plaintiff. Walker asked Keaton to leave the room. She advised plaintiff to calm down and warned her that her insubordinate behavior could put her job in jeopardy. She advised Keaton to speak quietly and calmly to plaintiff. Keaton reviewed the PIP and informed plaintiff that she was being placed on probation because of her poor performance as an overtime coordinator, her failure to keep adequate attendance records and to adhere to the attendance policies, and her refusal to implement the new mail delivery schedule.

On July 15, 1997, plaintiff filed a charge with the Ohio Civil Rights Commission. She claimed that Keaton was harassing her because of her race and disability.

On August 4, 1997, plaintiff again went on sick leave. On September 8, 1997, her psychologist, Dr. James Reardon, wrote to Lucent that plaintiff "would very likely be able to return to work should the company be able to provide her with alternate supervision." He stated that most of her anxiety and her anxiety related physical problems "relate to this specific problem with her present supervisor."

On October 8, 1997, plaintiff filed a second charge of discrimination with the Ohio Civil Rights Commission, alleging that she was harassed and forced to take disability leave in retaliation for the filing of her previous charge.

On October 14, 1997, Dr. Carandang, Lucent's medical director, consulted with plaintiff's treating physician regarding her Lupus. Her physician stated that she was not disabled to work as a result of her Lupus. On November 20, 1997, Dr. Carandang examined plaintiff. Plaintiff agreed that she was healthy, but stated that she did not want to return to work under Keaton. Dr. Carandang determined that plaintiff was fit to return to work.

On November 24, 1997, plaintiff was informed by letter that she was no longer qualified for sickness leave, and that future

absences would be considered personal days. She was directed to return to work on November 25, 1997, and told that failure to return to work could result in termination.

On November 25, 1997, plaintiff called Keaton and asked that any of her unused vacation and personal time be applied to cover her continued absence. She also sent a letter to Lucent's Chief Executive Officer to complain about harassment and retaliation after filing her charge with the Ohio Civil Rights Commission.

Plaintiff exhausted her vacation and personal time on December 9, 1997. On December 12, 1997, Keaton sent plaintiff another letter informing her that she would be terminated if she did not return to work by December 17, 1997. When she failed to return, Keaton sent plaintiff a third letter extending the deadline for her return to December 22, 1997. Her employment was terminated when she did not return to work on December 22, 1997. On February 19, 1998, plaintiff filed a third charge with the Ohio Civil Rights Commission alleging that she was fired because of her Lupus.

Plaintiff thereafter filed her complaint in this case alleging race and disability discrimination, harassment based on disability, and retaliation. Plaintiff also stated claims under the Employee Retirement Income and Security Act of 1974 (ERISA), 29 U.S.C. §§ 1132 and 11140. The district court granted summary judgment to Lucent on all of plaintiff's claims. Although the notice of appeal indicates that she is appealing from the entire judgment, plaintiff challenges in her brief only the dismissal of her claims of retaliation under

the ADA. Accordingly, plaintiff has waived all other arguments. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 881 (6th Cir.1996).[1]

II.

We review *de novo* the district court's grant of summary judgment. *See, e.g., Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997). Summary judgment is appropriate when there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

▆ The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by the [ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). Retaliation claims are treated the same whether brought under the ADA or Title VII. *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir.1997). A plaintiff need not actually be disabled to assert a claim of disability retaliation. The person, however, must have a reasonable and good faith belief that the opposed act or practice is unlawful under the ADA. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir.2000).

---

1. In her reply brief, plaintiff also argues that Lucent violated the ADA by not engaging in an interactive process. The district court concluded that defendant engaged in an appropriate interactive process. Because this issue was not raised in her initial brief on appeal, she has waived her right to challenge the district court's finding and cannot raise it for the first time in her reply brief. *See United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir.1993).

To establish a *prima facie* case of retaliation, plaintiff must show that (1) she engaged in protected activity, (2) defendant took an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Id.* at 578. If plaintiff establishes this *prima facie* case, the burden shifts to defendant to establish legitimate, nondiscriminatory reasons for the adverse employment action. Plaintiff must then demonstrate by a preponderance of the evidence that the proffered reasons were a mere pretext for discrimination by showing that (1) the proffered reasons have no basis in fact, (2) the proffered reasons did not actually motivate the action, or (3) they were insufficient to motivate the action. The plaintiff bears the burden of persuasion throughout the entire process. *Kocsis,* 97 F.3d at 883.

An adverse employment action requires a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some other actual and unfavorable change in job status. *Id.,* at 885. *De minimus* employment actions are not actionable:

> A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atl. Co.,* 188 F.3d 652, 662 (6th Cir.1999).

To show a causal connection, a plaintiff must produce sufficient evidence to infer that an employer would not have taken the adverse employment action had the plaintiff not engaged in a protected activity. *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir.1997); *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1068 (6th Cir.1990). A causal connection may be shown by direct evidence or by knowledge of the complaints on the part of the employer coupled with a closeness in time sufficient to create an inference of causation. *Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999).

On appeal, plaintiff argues Lucent took the following adverse employment actions after she engaged in protected activity: (1) placing her on the PIP; (2) increasing her workload when she was placed on the PIP; (3) refusing to transfer her to a different supervisor; (4) terminating her employment; and (5) denying her bonuses, awards, and stock options. She argues that there was causal connection between these adverse actions and the following protected activities: (1) her meeting with Young on June 16, 1997; (2) the charges filed with the Ohio Civil Rights Commission in July 1997 and October 1997; and (3) the letter to Lucent's CEO in November 1997.

### A. The PIP and Increased Work Load

Plaintiff alleges that she was given increased responsibilities under the PIP. She claims that the PIP and the increased workload under the PIP were adverse employment actions. We do not need to decide whether these were adverse employment actions because plaintiff has not shown a causal connection between these employment actions and protected activity.

The only alleged protected activity preceding these challenged employment actions was the meeting with Young, which occurred approximately two weeks before

plaintiff was placed on the PIP. The district court found that there was not sufficient evidence that plaintiff's meeting constituted protected activity under the ADA. While a communication may be protected even if it is vague or inartful, a plaintiff must still articulate opposition to what she reasonably believes to be unlawful activity under the ADA. *See Robinson v. S.E. Pa. Transp. Auth., Red Arrow Div.,* 982 F.2d 892, 896–97 (3d Cir.1993).

The memo that Young prepared after the meeting with plaintiff did not show that plaintiff ever complained about disability discrimination. Plaintiff did not offer any more detailed information on the meeting. Nor did she offer any contradictory description of her communication to Young. Plaintiff says she told Young that she was on sickness leave, and that she had Lupus and hypertension. She told him she wanted her work environment to be non-hostile because she believed it was contributing to her sickness. She told Young "about Keaton's abusive behavior which included screaming, yelling, being singled out and demeaning remarks."

The only statement remotely hinting at illegal conduct is contained in plaintiff's affidavit where she states: "[Keaton] was intentionally trying to exacerbate my lupus." She does not state, however, that she made this statement to Young. More importantly, this conclusory statement is in direct conflict with her deposition testimony:

Q. It's not your position that Willie Keaton treated you poorly because you have lupus?

A. Correct.

A. Okay. And it's not your position that Willie Keaton's treatment of you was because you had hypertension?

A. Correct.

A plaintiff may not create a factual issue by filing an affidavit in response to a summary judgment motion that contradicts her earlier deposition testimony. *Penny,* 128 F.3d at 415.

All that the evidence shows is that plaintiff told Young that Keaton's hostile behavior was making her sick. Plaintiff did not say anything to indicate to Young that she believed Keaton's actions were motivated by her Lupus or hypertension, or that Keaton was otherwise discriminating against her because of her alleged disability. The meeting with Young, therefore, did not constitute protected activity to support a retaliation claim with respect to her placement on the PIP or her increased workload.

### B. Refusal to Transfer Her to a New Supervisor

 Plaintiff argues that the refusal to transfer her to another supervisor was an adverse employment action. A refusal to grant a change requested by an employee is not an adverse employment action unless the employee has a right to the requested change by law or through the terms and conditions of his employment. *See Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997) (plaintiff showed that transfer was a common practice and so arguably a "privilege" of employment).

Up until she was placed on probation, plaintiff was free to apply for a new position within Lucent. She provided no evidence, however, that she applied for and was denied a transfer to a position for which she was qualified or otherwise entitled. Once plaintiff was placed on probation, she could not apply for a transfer within the company during the term of her probation. This was a standard condition of a PIP. As discussed above, plaintiff has not shown that her probation, which included the prohibition against transfer, was imposed by Lucent as a result of

protected activity. Thus, plaintiff has offered no evidence that she had a right, either legally or under the company's policies and practices, to a transfer. The failure to transfer her to a new supervisor upon her request, therefore, does not constitute an adverse employment action and cannot support a claim of retaliation.

## C. Termination

 Termination from employment is an adverse employment action. *Hollins,* 188 F.3d at 662. Plaintiff has failed to show, however, that her termination was causally connected to her protected activities. Plaintiff's termination occurred two and one-half months after her October 1997 charge filed with the Ohio Civil Rights Commission. Her termination occurred more than one month after she sent the letter to Lucent's CEO in November 1997. Temporal proximity alone in the absence of other direct or compelling circumstantial evidence is generally not sufficient to support a finding of causal connection. *See Nguyen v. City of Cleveland,* 229 F.3d 559, 566 (6th Cir.2000). Cases addressing this issue have said that temporal proximity may establish a *prima facie* case only if the temporal proximity is "very close." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). *See also, Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999) (absent additional evidence, two to five months insufficient to create a triable issue of causation); *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir. 1986) (four months insufficient to support an inference of retaliation).

Moreover, other facts negate any inferences that may arise from the temporal proximity between the protected activities and plaintiff's termination. First, Lucent sent four letters setting and then twice extending the deadline for plaintiff to return to work. This does not evidence an

intent to retaliate in response to protected activity. In addition, plaintiff sent the letter to Lucent's CEO *after* plaintiff was informed that she would be terminated if she did not return to work by a certain date. Thus, although her actual termination occurred after the letter to the CEO, the decision to terminate her was already being considered when she sent that letter.

Finally, Lucent offered a legitimate, nondiscriminatory reason for plaintiff's termination, job abandonment, that plaintiff has not shown is pretextual. Plaintiff argues that Lucent's reason was pretextual because it gave different reasons for her termination. When plaintiff applied for unemployment benefits, Lucent's agent informed the Ohio Bureau of Employment Services that plaintiff was terminated for "work performance issues." Lucent has presented evidence that its agent was informed by Lucent that plaintiff was terminated for job abandonment. In any event, a statement that plaintiff was terminated for work performance issues is not inconsistent with the proffered reason of job abandonment. This differing terminology does not raise a genuine issue of fact as to whether Lucent's proffered reason was pretextual. Plaintiff does not dispute that she was medically fit to return to work. Nor does she argue that she could legally refuse to return to a position under Keaton's supervision because of a disability. The undisputed fact is that plaintiff simply failed to return to work, and this was a legitimate, nondiscriminatory reason for terminating plaintiff's employment.

## D. Denial of Bonuses, Awards, and Stock Options

 Plaintiff claims that Lucent denied her bonuses, awards, and stock options in retaliation for her protected activity, including the charges filed with the Ohio Civil Rights Commission. Plaintiff has not shown that she was entitled to the bonus-

844

es, awards, or stock options and thus has not shown that she suffered an adverse employment action.

The bonuses and awards of which plaintiff complains were all based on merit. They were awarded by Lucent at the end of the year based on performance during that year. Plaintiff argues that she had earned the bonuses and awards based on her performance prior to her termination. She argues that whether her performance merited the bonuses and awards is a material issue of fact precluding summary judgment. Plaintiff, however, was terminated prior to the end of the year. She does not allege the bonuses and awards were awarded and distributed in 1997 prior to her termination. Plaintiff also offered no evidence that an employee who voluntarily quits or who is involuntarily terminated from Lucent is entitled to receive bonuses and awards awarded after his termination of employment.

Plaintiff also claims she suffered an adverse employment action when she was denied benefits under a program called the Global Founders Grant Stock Option Plan. This plan permitted certain employees to purchase Lucent stock on October 1, 1999. Because plaintiff was no longer employed by Lucent on that date, she was not eligible to participate.

Plaintiff did not receive the bonuses, awards, and stock options because her employment was terminated for a legitimate, nondiscriminatory reason. The failure to receive these benefits was not in any way related to the charges filed with the Ohio Civil Rights Commission. Because her termination was not a retaliatory act, the fallout from that termination cannot be an adverse employment action.

AFFIRMED.