NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0318n.06

Case No. 19-3433

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 03, 2020
DEBORAH S. HUNT, Clerk

DORIS L. STEWART,                            )
                                             )
    Plaintiff-Appellant,              )
                                             )   ON APPEAL FROM THE UNITED
v.                                           )   STATES DISTRICT COURT FOR
                                             )   THE SOUTHERN DISTRICT OF
MARK T. ESPER, Secretary of Defense,         )   OHIO
United States Department of Defense,[*]      )
                                             )
    Defendant-Appellee.               )

---

BEFORE: SILER, GIBBONS, and READLER, Circuit Judges.

SILER, Circuit Judge. Doris Stewart appeals from the district court's grant of summary judgment to the Secretary of Defense on her Title VII claims of discrimination, a hostile work environment, and retaliation. For the following reasons, we AFFIRM.

**I.**

Stewart, an African-American woman, is employed by the Defense Finance and Accounting Service ("DFAS")—part of the Department of Defense—in Columbus, Ohio as an

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Secretary of Defense Mark T. Esper has been substituted for the former Secretary of Defense as the defendant in this case.

Information Technology Specialist.[1]  Stewart alleges that since 2013 she has been subject to disparate treatment discrimination—based on her race, color, and sex—and a hostile work environment.  She also alleges that she was retaliated against for filing a complaint with the Equal Employment Opportunity Commission ("EEOC").  Her allegations center around her interactions with her coworkers and supervisors, especially her interactions with her coworker Guy Moran.  Stewart alleges numerous incidents to support her claims, which she divides into nine categories:

1. Denials of certification;
2. Removal from appointment as Security Manager;
3. All meaningful work withdrawn and assigned to others;
4. Denied access to special assignments and promotions;
5. False accusations and threats to coworkers that [Stewart] was going to take away their security credentials;
6. Ongoing offensive behavior by the System Manager;
7. Directed to engage in meetings with contract audit teams and senior management then denied access to the meetings by System Manager;
8. Accepted offer to a Command Center Lead Director position was withdrawn the following day due to the System Manager's influence; and
9. Reprised against for pointing out flaws in system security.

*(1) Denials of certification*.  Stewart unsuccessfully tried to obtain a Security+ certification. To get this certification, an individual must pass an exam.  Stewart took the exam and did not pass. When offered the opportunity to retake the exam, she declined.  As a result, she did not obtain the Security+ certification.  Stewart asserts that she was given extra work that prevented her from being able to study for the exam, the exam was made harder to keep her from passing, and, unlike other DFAS employees, she was not allowed to study for the exam during work hours.

*(2) Removal from appointment as Security Manager*.  Stewart was appointed as the Departmental Cash Management Systems ("DCMS") Information Systems Security Manager

---

[1] For clarity, we will refer to the defendant and Stewart's employer as DFAS throughout this opinion.

("ISSM") on December 30, 2013. The appointment did not include a salary increase, an official change in work hours, an increase in supervisory responsibility, or any other benefit. The position required a Security+ certification, but an individual without the certification could be appointed to the position for up to six months, and could continue in the position if she thereafter obtained the certification. Because Stewart never obtained the certification, she could not remain in the position beyond June 30, 2014.

The DCMS ISSM typically worked on two systems—Mainframe and Mid-Tier. On April 30, Moran notified Stewart that the ISSM position was being bifurcated and she would thereafter only serve as ISSM for Mainframe. However, the bifurcation never occurred. Stewart claims Moran attempted to remove her as the ISSM for Mid-Tier to harass her and as retaliation for pointing out security flaws. Moran says his intent was to make the ISSM's workload more manageable.

After Stewart failed the Security+ exam and indicated that she was not going to retake it, Stewart's supervisor, Leisha Hickman, began looking for someone to replace Stewart as ISSM. After a replacement was found, Stewart was removed from the ISSM position on June 11. Stewart was replaced by Tracy Nelson, a white woman who had a Security+ certification and had previously served as the ISSM.

*(3) All meaningful work withdrawn and assigned to others*. Stewart alleges numerous instances of what she categorizes as DFAS withdrawing work from her. These instances fall into four categories: (a) the Green Belt project; (b) denial of access to computer systems; (c) Moran frustrating her ability to do her job; and (d) being forced to train her replacement.

*(a) The Green Belt project*. Stewart was assigned to be part of a Green Belt project team. When she was assigned, there was disagreement among various DFAS employees involved with

the project about its viability and, after she started working on the project, Stewart had issues with how it was being run. Stewart did not receive any disciplinary action as a result of her participation in the project, was not threatened with any disciplinary action, and did not lose any material benefits because of it. The only negative consequence from being part of the project team that she complains of is "not being able to get management to provide the project a firm foundation" on which to start, which resulted in "chaos and confusion."

(b) *Denial of access to computer systems/programs.* To help her complete a special assignment, Stewart requested access to the "eMASS" computer system, but her request was denied. Stewart says that she completed the forms to get access to eMASS and gave them to her supervisor, but she was told that she could not have access. Although she admits that it was not strictly necessary to have access to eMASS to complete the assignment, she claims that not having access interfered with her ability to complete it because working on the assignment without access to eMASS was like working "with [her] hands tied behind [her] back." Stewart obtained access to eMASS during the second month of the special assignment.

(c) *Moran's Alleged Behavior.* Stewart complains that Moran impeded her ability to complete her work assignments in various ways. She alleges that Moran routinely objected to what she was doing, systematically reduced her workload, found ways to frustrate her work, belittled and marginalized her, and attempted to paint her as "an angry black woman" to others in the office. Moran assigned a white female coworker the task of creating a "simple test plan template," a project which Stewart felt should have been hers. When Darryle Gross was Stewart's supervisor, he delegated to Moran the task of assigning work to Stewart. On October 19, 2015, Stewart informed Gross that Moran was not assigning her meaningful work. Gross then instructed Moran to provide Stewart with meaningful work. On November 13, after additional back-and-

forth about Stewart's not having proper qualifications for much of the work, Moran appointed Stewart as DCMS Main Frame Configuration and Release Manager and requested that she help with a Black Belt project.

*(d) Training her replacement*. When Stewart was serving as Configuration Manager, her supervisor, Abigail Parsons, had her train Kirk Shelby—a white male coworker who Stewart says lacked experience—to be Configuration Manager. After he was trained, Shelby took over as Configuration Manager from Stewart. According to Parsons, Shelby was trained to be the Configuration Manager because Stewart was the only trained Configuration Manager, so there was no one to cover the position if Stewart went on vacation or was otherwise unavailable. Thus, according to Parsons, she had Stewart train Shelby and, after Shelby was trained, Shelby temporarily served as the primary Configuration Manager to complete his training. Stewart was given additional work to supplement the temporary decrease in her workload.

*(4) Denied access to special assignments and promotions*. Stewart claims that she was denied special assignments, but she does not point to any special assignments she was denied, except the previously discussed "simple test plan template" that Moran assigned to a white female coworker. Stewart also alleges that she applied for, but was not selected for, "a GS-13 2210 position." She says that hiring for the position was through a competitive selection process, that she was found qualified for the position, but that she was not interviewed for it. Stewart believes that Jill Moser, a white female DFAS employee, was selected for the position. Stewart does not know what Moser's qualifications were, but she assumes that they were as good as hers.

*(5) False accusations and threats to coworkers that Stewart was going to take away their security credentials*. Stewart alleges that Moran spread a rumor about her to Diana Ritzert, another DFAS employee, that Stewart was planning to revoke Ritzert's security access. Stewart says she

heard about this from Ritzert, but Ritzert remembers the conversation differently. She says that Moran told her that either he or Stewart "was going to remove some access" from some individuals, but she does not remember Moran's saying anything about Stewart's planning to remove her security access in particular.

*(6) Ongoing offensive behavior by the System Manager.* Stewart next asserts that she was frequently harassed and belittled by Moran. First, she claims that Moran referred to her as "an angry black woman" on numerous occasions. But she only points to one specific instance of this. Second, while speaking with a coworker, Moran said "I loves me some Denzel Washington." Stewart says there had not been a conversation about movies or actors prior to his making this comment. Third, Stewart claims that Moran made comments about her physical appearance, including: "you get all those special assignments because you're pretty and wear all those pretty dresses." Fourth, during a group conversation where Stewart was the only African-American present, Moran asked her if she wanted to listen to the rapper Lil' Wayne with him. Fifth, while speaking with another coworker, Moran stated, "I haven't been to the gun range lately." Stewart was behind a wall, so she did not see Moran when he made this comment or see whom Moran was talking to. Despite not being mentioned in the conversation or being part of it, Stewart believes that this comment was a threat directed toward her.

*(7) Directed to engage in meetings with contract audit teams and senior management then denied access to the meetings by System Manager.* Stewart's next claim is that Moran denied her access to an audit-readiness meeting. According to Stewart, Moran blocked the doorway to prevent her from entering the meeting room and, in a loud and offensive manner, asked why she was there and told her that her presence at the meeting was not required. She informed Moran that her supervisor had instructed her to be there, stepped around him, entered the meeting room, and

sat down. Moran then angrily came into the room, gathered up his belongings, and left. Stewart claims that everyone in the room witnessed the incident, and she felt humiliated. However, nobody present at the meeting heard raised voices or saw Moran block her access to the meeting room.

*(8) Accepted offer to a Command Center Lead Director position was withdrawn the following day due to the System Manager's influence.* Stewart claims that Kenneth McTyer offered her the position of DCMS Command Center Lead Director, and she accepted the position on the spot, but soon thereafter, the offer was revoked without a reason being given. McTyer said that Stewart was never offered the position; rather he only asked if she was willing to consider it. McTyer also said that he did not have the authority to offer the position to her.

*(9) Reprised against for pointing out flaws in system security.* Finally, Stewart alleges she was retaliated against for pointing out security flaws. On two occasions, she notified Moran, Ritzert, and Wayne Hansen about security flaws. It was shortly after this that Moran attempted to remove Stewart as the ISSM for Mid-Tier and that she was removed from being the ISSM altogether. DFAS contends that the reason for her removal from the ISSM position was not that she pointed out security flaws, but that she did not obtain the required Security+ certification.

On September 14, 2015, Stewart filed a complaint with the EEOC alleging that, since 2013, she had been subjected to disparate treatment discrimination and a hostile work environment. The EEOC rendered a final agency decision finding insufficient evidence to support Stewart's claims. Stewart then filed a complaint in district court alleging disparate treatment discrimination based on her race, color, and sex; a hostile work environment; and retaliation. The district court granted DFAS's motion for summary judgment, which Stewart now appeals.

**II.**

We review a district court's grant of summary judgment de novo, viewing all evidence in the light most favorable to the non-moving party. *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 503 (6th Cir. 2017) (en banc).

A.  Disparate Treatment Discrimination

Title VII provides that an employer may not "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Where, as here, the plaintiff relies on circumstantial evidence to prove her claim, we apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, the plaintiff must first make out a prima facie case of discrimination, which requires the plaintiff to show that:  (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016).  DFAS does not contest that Stewart is a member of a protected class or that she is qualified.

An adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (alterations in original) (quoting *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)).  An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Other material adverse actions such as "a less

distinguished title, diminished options for advancement, or other unique indices" can constitute adverse employment actions. *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006) (citations omitted). But not every act affecting an individual's employment constitutes a materially adverse change. *McMillian v. Potter*, 130 F. App'x 793, 796 (6th Cir. 2005). "Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (citations omitted). And de minimis employment actions are not materially adverse. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Whether something constitutes an adverse employment action is viewed objectively, and the question is whether the employment action was "objectively intolerable to a reasonable person." *Policastro*, 297 F.3d at 539.

To show that a similarly situated non-protected employee was treated more favorably, the plaintiff must show that the employee who was treated more favorably is similar to the plaintiff in "all *relevant* respects." *Ercegovich v.Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in original). The other employee or employees ordinarily "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 364 (6th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). For the plaintiff to meet her burden, she must do more than make "generalized and vague allegations" that another employee was treated better than her. *See Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 147 (6th Cir. 2007).

If a plaintiff can meet her burden to establish a prima facie case of discrimination, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision.

*Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). If the employer carries its burden, the plaintiff must prove by a preponderance of the evidence that the employer's offered reasons were pretextual. *Id.*

The district court concluded that Stewart was unable to establish a prima facie case of discrimination because she could neither establish that she was subjected to an adverse employment action nor that similarly situated non-protected employees were treated more favorably. In addition, the district court found that even if Stewart could establish a prima facie case of discrimination, she did not establish that the proffered legitimate, nondiscriminatory reasons offered by DFAS for many of the actions of its employees were pretextual. We agree with the district court that Stewart has not met her prima facie burden.

*(1) Denials of certification.* Stewart complains that she was denied "required and/or job-related certifications." The only certification she points to having been denied is the Security+ certification. But she merely claims that individuals outside her protected class were treated more favorably, without identifying any particular similarly situated employee. *See Younis*, 610 F.3d at 364 (requiring the plaintiff to identify a particular individual or individuals as comparators). Further, even if Stewart could establish a prima facie case, she has not overcome DFAS's proffered reason for her being denied the certification—that she failed the certification exam and refused to retake it.

*(2) Removal from appointment as Security Manager.* Stewart has not established that Moran's unsuccessful attempt at bifurcating the ISSM position or that her removal from the position were adverse employment actions. Moran's unsuccessful attempt at bifurcating the position was just that—unsuccessful—and Stewart has not shown any harm caused by it. And her removal as the ISSM—which left her salary, work hours, and supervisory authority unchanged—

occurred only nineteen days before her six-month term was set to expire. At most, this is a de minimis employment action. *See Bowman*, 220 F.3d at 462.

(3) *All meaningful work withdrawn and assigned to others*. Stewart alleges several ways in which meaningful work was taken away from her and given to others. In this category she includes her assignment to a Green Belt project team, but her only complaint about the project is that it was dysfunctional, not that anything materially adverse resulted from it. The initial denial of Stewart's request for eMASS access was a "mere inconvenience," which does not rise to the level of being materially adverse, as she was able to complete the project without access to it, and she received access within a month. *See Kocsis*, 97 F.3d at 886. Stewart also includes several actions by Moran in this category. Her allegation that a single project was assigned to an unnamed white woman rather than to her, where the record includes numerous projects that Stewart was assigned, would at most be a de minimis employment action. *See Bowman*, 220 F.3d at 462. Stewart's complaint to Gross about Moran's not assigning her meaningful work resulted in her receiving sufficient work within three and a half weeks. This short and temporary period without sufficient work does not rise to the level of a materially adverse action. Stewart's remaining allegations about Moran—such as his objecting to what she was doing, belittling her, or marginalizing her—do not point to any specific acts that he did and are thus too generalized and vague to constitute a prima facie case of discrimination. *See Frazier*, 250 F. App'x at 147.

Stewart also cannot show that being asked to train Shelby was an adverse employment action: the role-reversal was temporary, her salary remained the same, and she was given additional work to supplement her reduced workload. *See Bowman*, 220 F.3d at 462 (stating that temporary actions not resulting in a loss of salary or benefits are not materially adverse employment actions). Nor has she presented any evidence that DFAS's proffered reason for

having her train Shelby and having him temporarily take over the position—to have an additional person trained for the job in case Stewart was unavailable—was pretextual.

(4) *Denied access to special assignments and promotions*. Other than the Command Center Lead Director position, discussed below, the only promotion that Stewart alleges she was denied is a GS-13 position that she applied for and that she believes Moser, a white woman, received. But Stewart cannot establish a prima facie case because she points to nothing in the record to show that Moser was similarly situated: Moser worked in a different section, had a different supervisor, and Stewart does not know what her qualifications were. *See Toledo Hosp.*, 964 F.2d at 583. Stewart also claims to have been denied the opportunity to work on special assignments, but elsewhere claims to have been given special assignments "over and over again." And she contradicts herself by claiming that being assigned special assignments is a form of punishment. Because of these contradictions, Stewart has not shown that she was denied the opportunity to work on special assignments or that not being given them would be materially adverse.

(5) *False accusations and threats to coworkers that Stewart was going to take away their security credentials*. Stewart alleges that Moran falsely accused her of planning to revoke Ritzert's security access, but she does not point to anything materially adverse that resulted from this incident. Spreading rumors like this falls into the category of "petty slights or minor annoyances that often take place at work" but that are not materially adverse. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

(6) *Ongoing offensive behavior by System Manager*. Stewart claims that a series of offensive comments made by Moran either to her or to other DFAS employees constitutes discrimination. However, an adverse employment action requires a "materially adverse change in the terms and conditions of employment" *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 662 (6th Cir.

1999) (citation omitted). Moran's comments themselves do not constitute such a materially adverse change, nor does Stewart allege that the comments resulted in any such change.

*(7) Directed to engage in meeting with contract audit teams and senior management then denied access to the meetings by System Manager.* Next, Stewart alleges that Moran unsuccessfully attempted to prevent her from attending a meeting. But Stewart was only briefly held up outside the meeting room, she attended the meeting, and she was not late for it. Even if people overheard Moran yelling at her, the incident and Stewart's feeling humiliated by it is a petty slight and does not constitute an adverse employment action. *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68; *cf. also Farragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (holding that our review must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" (citation and internal quotation marks omitted)).

*(8) Accepted offer to a Command Center Lead Director position was withdrawn the following day due to the System Manager's influence.* Stewart claims that McTyer offered her the Commander Center Lead Director position, then revoked it. She does not explain how this position would have materially affected her salary, benefits, or responsibilities. *See Kocsis*, 97 F.3d at 886 (holding that a job transfer was not an adverse employment action because the plaintiff had the same "rate of pay and benefits, and her duties were not materially modified"). Instead, she only alleges that this position would have "very high visibility" and is a stepping stone to advancement. Although the denial of a more prestigious position can amount to an adverse employment action, Stewart has the burden to show that this position was more prestigious. S*ee Freeman*, 200 F. App'x at 444-45. But she has only provided conclusory statements to that effect without providing evidence. Therefore, she has not met her burden to show that revoking this position would

- 13 -

constitute an adverse employment action. Stewart has also not shown that the reason proffered by DFAS—that McTyer did not have the authority to offer her the position in the first place—was pretextual.

*(9) Reprised against for pointing out flaws in system security*. Stewart's final allegation is that she was removed from the ISSM position because she pointed out security flaws in the system. On its face, this allegation fails because she claims that she was removed in retaliation for pointing out security flaws, not that she was removed because of her race, color, or sex.

Even when viewed together, Stewart's allegations do not demonstrate that she suffered a materially adverse change in the terms or conditions of her employment. She also has not shown that she was treated less favorably than individuals outside of her protected class. And, even if we were to assume that Stewart could establish a prima facie case of discrimination based on any of these theories, she has not established that the legitimate, non-discriminatory reasons proffered by DFAS for the above-described actions were pretextual. Therefore, the district court did not err by granted summary judgment on Stewart's discrimination claim.

## B. Hostile Work Environment

To establish a prima facie case of a hostile work environment based on circumstantial evidence, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race, color, or sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the employer knew or should have known about the harassment and failed to act. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011); *see also Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016) (addressing hostile work environment based upon sex). The conduct must be objectively hostile or abusive and the

victim must also subjectively perceive the environment to be abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)  The alleged incidents of unwelcome harassment are to be considered together to determine whether, under the totality of circumstances, they constitute a hostile work environment. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).

"In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks and citation omitted). "Simple teasing, [] offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotation marks and citations omitted).

Stewart's hostile work environment claim is based on the same factual allegations as her disparate treatment claim. DFAS concedes the first element of a prima facie claim. The district court found that the allegations that directly involved Moran were sufficient to create a genuine issue of material fact as to whether she was subjected to unwelcome harassment because of the "indisputably strained relationship" between Stewart and Moran. But, even assuming that Moran's harassing conduct was based on Stewart's race, color, or sex, the district court concluded that the conduct was not sufficiently severe or pervasive. As to the other allegations, the district court did not address whether they constituted unwelcome harassment, but granted summary judgment because there was no evidence in the record which would allow a reasonable jury to conclude that the actions were based on Stewart's race, color, or sex.

We agree with the district court that Stewart has not established a prima facie case. With the exception of the allegations related to Moran, there is nothing in the record to suggest any of the actions were based on Stewart's race, color, or sex. And even assuming the actions by Moran were based on Stewart's race, color, or sex, the severe and pervasive requirement is a high bar. *See Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017). Title VII does not create a "general civility code" and sporadic abusive language or offensive comments are not sufficient to support a claim. *Faragher*, 524 U.S. at 788 (citation omitted). On this record, Stewart's complaints about Moran do not amount to conduct so severe or pervasive as to amount to a change in the terms and conditions of her employment. Therefore, the district court did not err in granting summary judgment on Stewart's hostile work environment claim.

### C. Retaliation

To establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in Title VII protected activity; (2) the employer knew that she engaged in that protected activity; (3) the employer subsequently took an adverse employment action against her; and (4) the adverse action was causally connected to the protected activity. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). DFAS does not contest the first two elements.

Stewart's relies on the same evidence for her retaliation claim as she does for her discrimination and hostile work environment claims. However, as already discussed, she fails to establish that she suffered from any adverse employment action.

Stewart's retaliation claim also fails because she does not show a causal connection between her EEOC complaint and the actions she claims were retaliation for making the complaint. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) (requiring the plaintiff to produce evidence "from which one could draw an inference that the employer would not have

taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects"). Because she uses the same evidence to support her retaliation claim as she uses for her other claims, the vast majority of the alleged incidents occurred before she filed her EEOC complaint. In response to this temporal problem, Stewart merely claims that "many" or "most" of the "discriminatory acts, statements/and or omissions [made by Gross, Parsons, or Moran, or] identified in the evidence," occurred after she filed her EEOC complaint, without identifying the specific acts, statements, or omissions to which she is referring. Without more, Stewart cannot establish a causal connection.

Moreover, if some of the actions occurred before and some after she filed her complaint, she has not shown a causal connection between the complaint and the alleged retaliatory actions since they were part of an ongoing pattern that predated the complaint. *See Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010) (requiring evidence that the adverse employment action would not have occurred "but for [the plaintiff's] engagement in the protected activity"). For example, the one incident which she specifically alleges occurred after September 14, Moran's not giving her meaningful work, was preceded by what she claims was several years of harassment by Moran. In addition, any of the allegations that could be construed as having potentially occurred after September 14 are so general and vague that the record is insufficient to establish a causal connection between them and her EEOC complaint. *See Abbot*, 348 F.3d at 543 (requiring the plaintiff to produce sufficient evidence to allow an inference to be drawn between the protected activity and the retaliatory act). Therefore, the district court did not err in granting summary judgment on Stewart's retaliation claim.

AFFIRMED.